**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

TIFFANY McELROY; BRENDA BAILEY
as next friend of BABY B.T., a minor,

                Plaintiffs,

      v.

HOUSTON COUNTY, ALABAMA;
HOUSTON COUNTY COMMISSION;
HOUSTON COUNTY SHERIFF
DONALD VALENZA, *in his individual
capacity*; MARQUEL BISHOP, DAVIAN
BURSE, CALEB CREECH, "DOE"
GRACE, JAYCEN HAMMOND,
DARLENE HAYDER, ACHREF
HAYDER, JESSICA JOHNSON, "DOE"
MARCUS, DESHAWN MORENO, TONY
MURPHY, LARODERICK ROBERTS,
JASON SMOAK, JAMES TRAWICK,
MELINDA VAN ACKERN, BRENDA
VAN REIL, and KATHY
YOUNGBLOOD, *in their individual and
official capacities*,

                Defendants.

CIVIL ACTION NO.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Tiffany McElroy and Brenda Bailey as Next Friend of Baby B.T.,[1] a minor, by

and through counsel, bring this action against Defendants and allege as follows:

### INTRODUCTION

1.     On May 27, 2024, Tiffany McElroy, a 26-year-old woman from Dothan, gave birth

to Baby B.T. on the floor of the Houston County Jail. Assisted only by the women detained

alongside her, Tiffany labored for more than 24 hours as those women watched over her, coached

---

[1] As Baby B.T. is a minor, Plaintiffs use the minor's initials pursuant to Fed. R. Civ. P. 5.2(a).

1

her through labor, and successfully resuscitated Baby B.T. when she was born not breathing. Throughout this ordeal, Tiffany and the other detained women around her begged jail staff for help, banging on the walls and tables until their hands ached, and pleading with guards to take Tiffany to the hospital where she could safely deliver her baby. Their cries for help went unanswered. Tiffany and Baby B.T. survived only because of the quick thinking, courage, compassion, and collective action of the women detained in the jail.

2.      In stark contrast to the heroic actions of the detained women, the Houston County Jail officers present during Tiffany's labor displayed an astonishingly callous disregard for her health and safety and for the health and safety of Baby B.T. The guards unnecessarily forced Tiffany to endure a dangerous, painful, terrifying birth experience with no medical assistance. They dismissed Tiffany's insistence that her water had broken. They refused any assistance or accommodations to Tiffany during her labor. They forced Tiffany to physically engage in regular jail routines even as her labor advanced. Aside from an offer of Tylenol and a diaper, staff ignored Tiffany's cries of pain, leaving her to labor in unsanitary conditions all day and all night as her screams echoed throughout the bay, and as officers watched her excruciating labor with a clear view from the officers' booth.

3.      The guards also threatened and punished the women who *were* helping Tiffany, threatening them with violence if they did not comply and telling them not to touch Tiffany and to return to their own bunks. The guards made no effort whatsoever to take Tiffany to the hospital until after Baby B.T. was born, more than 24 hours after Tiffany's water broke. Baby B.T., a premature infant born into the jail's custody and care, received no medical attention while at the jail.

4.      From the moment Tiffany's water broke and her labor began, both Tiffany and

2

Baby B.T. had obvious, serious medical needs of which the jail officers were aware, and their failure to take even minimal action to provide mother and daughter with care, assistance, or transport to the hospital exposed Tiffany and Baby B.T. to a dramatically increased risk of serious harm. This constitutes deliberate indifference under the Fourteenth Amendment to the United States Constitution.

5.      But the failures of the staff at the Houston County Jail during Tiffany's labor and Baby B.T.'s birth are only one part of this story: Houston County boasts the dubious distinction of detaining pregnant and postpartum women at an unusually high rate. So, it was both foreseeable and obvious that Defendants' deliberate indifference to the serious medical needs of Tiffany and Baby B.T. would lead to breaches of care and needless pain, suffering, and injuries. Houston County's failure to provide medical care to pregnant and postpartum women is not a rare or isolated occurrence; it is a routine and ongoing issue. Houston County has a long history of underfunding medical care for its jail and failing to provide adequate medical care for its detained population, leading to deaths, miscarriages, and other likely avoidable medical catastrophes.

6.      At the time of Tiffany's labor and Baby B.T.'s birth, Houston County was on notice and had knowledge that its policies, customs, and practices were harmful to the health and wellbeing of pregnant women in its custody, including Tiffany. Despite this knowledge, Houston County did nothing to ensure that pregnant women in its jail received adequate medical care or access to medical care. By failing to take any minimally adequate action to address the resulting deficiencies in care, the Houston County Commission, as the final policymaker of Houston County, exacerbated the problem and demonstrated deliberate indifference to the health and safety of Tiffany, Baby B.T., and all those detained and entrusted to Defendants' care.

7. Accordingly, Tiffany and Baby B.T. now seek damages under Alabama law and pursuant to 42 U.S.C. § 1983 for the egregious violation of their constitutional rights.

## JURISDICTION AND VENUE

8. This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiffs bring this action under 42 U.S.C. § 1983 to remedy violations of their constitutional rights.

9. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims arising under the laws of the State of Alabama, because those state law claims are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as the events giving rise to Plaintiffs' claims occurred in this judicial district. In addition, on information and belief, all Defendants reside in the state of Alabama and at least one Defendant resides in this judicial district.

## PARTIES

11. Plaintiff Tiffany McElroy is a resident of Dothan, Alabama. During the events giving rise to this action, Ms. McElroy was detained pretrial at the Houston County Jail ("HCJ") in Dothan, Alabama.

12. Plaintiff Baby B.T. is a minor child residing in Dothan, Alabama. Baby B.T. was born at the Houston County Jail in Dothan, Alabama on May 27, 2024. Baby B.T. brings this action through her next friend, Brenda Bailey, who also resides in Dothan, Alabama, and is authorized to bring this action on Baby B.T.'s behalf.

13. Defendant Houston County, Alabama ("Houston County") is a municipal corporation organized and existing under the laws of the State of Alabama with the ability to sue and be sued within the State of Alabama. Houston County is responsible for providing funding to

4

the HCJ, including for medical care, and is responsible for the policies, customs, and practices related to the funding of the facility.

14.     Defendant Houston County Commission is the governing body responsible for, among other matters, erecting and maintaining county jails such as HCJ. The Houston County Commission also oversees budgetary matters for Houston County. The Houston County Commission's responsibility for maintaining county jails includes a duty to properly fund medical care.

15.     Defendant Sheriff Donald Valenza is, and was at all relevant times, the Sheriff of Houston County, acting under color of state law and within the scope of his employment. In this position, Sheriff Valenza is responsible, through the Houston County Sheriff's Office, for the operation of the HCJ. Sheriff Valenza has final authority and responsibility for administering, managing, and supervising medical care services at the HCJ. Sheriff Valenza is sued in his individual capacity.

16.     Defendant Corporal Marquel Bishop was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of his employment. Defendant Bishop is sued in both his individual and official capacities.

17.     Defendant Deputy Davian Burse was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of his employment. Defendant Burse is sued in both his individual and official capacities.

18.     Defendant Sergeant Caleb Creech was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of his employment. Defendant Creech is sued in both his individual and official capacities.

19.      Defendant "Doe" Grace was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of her employment. Defendant Grace is sued in both her individual and official capacities.

20.      Defendant Deputy Jaycen Hammond was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of his employment. Defendant Hammond is sued in both his individual and official capacities.

21.      Defendant Sergeant Darlene Hayder was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of her employment. Defendant D. Hayder is sued in both her individual and official capacities.

22.      Defendant Deputy Achref Hayder was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of his employment. Defendant A. Hayder is sued in both his individual and official capacities.

23.      Defendant Deputy Jessica Johnson was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of her employment. Defendant Johnson is sued in both her individual and official capacities.

24.      Defendant Officer "Doe" Marcus was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of their employment. Defendant Marcus is sued in both their individual and official capacities.

25.      Defendant Deputy Deshawn Moreno was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of his employment. Defendant Moreno is sued in both his individual and official capacities.

26.     Defendant Sergeant Tony Murphy was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of his employment. Defendant Murphy is sued in his both individual and official capacities.

27.     Defendant Corporal Laroderick Roberts was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of their employment. Defendant Roberts is sued in both their individual and official capacities.

28.     Defendant Jason Smoak was, at all relevant times, a licensed physician assistant at the HCJ, acting under color of law and within the scope of his employment. Defendant Smoak is sued in both his individual and official capacities.

29.     Defendant Lieutenant James Trawick was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of his employment. Defendant Trawick is sued in both his individual and official capacities.

30.     Defendant Nurse Melinda Van Ackern was, at all relevant times, an employee of Houston County and worked as a licensed practical nurse at the HCJ, acting under color of law and within the scope of her employment. Defendant Van Ackern is sued in both her individual and official capacities.

31.     Defendant Lieutenant Brenda Van Reil was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of her employment. Defendant Van Reil is sued in both her individual and official capacities.

32.     Defendant Deputy Kathy Youngblood was, at all relevant times, an employee of Houston County and worked in the HCJ, acting under color of law and within the scope of her employment. Defendant Youngblood is sued in both her individual and official capacities.

**FACTS**

I.    **Defendants Were Deliberately Indifferent to Ms. McElroy's and Baby B.T.'s Serious Medical Needs.**

33.    When Tiffany McElroy went into labor at the HCJ on May 26, 2024, she and other women at the jail repeatedly begged Defendants for help, to call 911, and to take Tiffany to the hospital. For over 24 hours, Defendants ignored her serious medical needs and her pleas for help—even while she was very obviously in labor and screaming in agony—and ultimately forced her to give birth in the jail without any medication or assistance from jail staff or medical professionals.

34.    By denying Tiffany essential medical care during labor and delivery, and failing to provide any medical care to Baby B.T. at birth, Defendants showed callous and deliberate indifference to Tiffany's health and safety and to the health and safety of Baby B.T.

35.    As a direct result of Defendants' conduct, Tiffany experienced extreme physical, mental, and emotional pain and suffering.

**A.    May 23: Ms. McElroy Is Approximately 34 Weeks Pregnant When She Is Booked into the Houston County Jail.**

36.    On or around May 23, 2024, Tiffany was arrested on a chemical endangerment charge and transported to the HCJ. She was approximately 34 weeks pregnant at the time of her arrest.

37.    Not only did Tiffany directly inform the jail at booking that she was in her third trimester of pregnancy, but it was also visibly obvious. Defendants—specifically Defendants Bishop, Burse, Creech, Grace, Hammond, D. Hayder, A. Hayder, Johnson, Marcus, Moreno, Murphy, Roberts, Smoak, Trawick, Van Ackern, Van Reil, and Youngblood—also knew or had reason to know that Tiffany was pregnant from the moment she arrived at the jail because her chemical endangerment charge stemmed from an allegation of substance use during pregnancy.

Tiffany's medical needs around her pregnancy were particularly serious because she had a history of preterm labor.

38.     When she arrived at the HCJ, Tiffany was housed on the bottom floor of Oscar ("O-Pod"), one of multiple "pods" into which HCJ housing is divided. O-Pod is a two-level structure with four "bays" on the upper level and four bays on the lower level. Each bay contains multiple bunk beds. The bays do not have doors; a person standing in the middle of O-Pod can see into the bays. Similarly, noise travels easily between the bays and throughout the two floors of the pod, such that women housed in one bay can hear noises coming from other bays. Within the pod is an officers' booth with one-way glass—people detained in O-Pod cannot see into the booth, but officers sitting in the booth have a clear view of O-Pod.

**B.     May 23 to May 26: Defendants Ignore Protocol and Fail to Provide Basic Pregnancy Accommodations to Ms. McElroy.**

39.     From the beginning of her detention, Defendants failed to provide Tiffany with required prenatal care or pregnancy accommodation. According to HCJ protocol, pregnant women should receive an extra sleeping mat, a bottom bunk or "boat" bed near the floor, an extra tray at mealtimes, and a late-night snack. Throughout Tiffany's first several days at the jail, Defendants ignored these requirements. Instead, HCJ staff treated Tiffany the same as the other detained women who were not pregnant.

40.     Despite the jail's policy to assign pregnant women a bottom bunk or boat bed near the floor because of the health risks associated with falls, HCJ officials assigned Tiffany a top bunk and provided her only one flat and ripped-up sleeping mat. Another detained woman, Christina Hansberry, had to ask a woman on a bottom bunk to switch beds with Tiffany.

        **i.**        **May 26, Midnight to Approximately 7 a.m.: Defendants Refuse Medical Assistance to Ms. McElroy after Her Water Breaks.**

41.      Early in the morning on May 26, 2024, Tiffany's water broke while she was in the bathroom. Tiffany felt a lot of slimy liquid and knew from her prior pregnancies that this was amniotic fluid. She screamed out that her water had broken and that there was a mess on the floor.

42.      Tiffany's water broke before 37 weeks of pregnancy, which is defined as preterm premature rupture of membranes ("PPROM"), and poses serious risk of infection. This risk increases as more time passes between water breaking and delivery; prompt medical care is necessary to avoid imperiling the life of the mother and baby.[2] Patients with PPROM should be evaluated by a qualified provider as soon as possible to assess for labor, bleeding, risk of infection, and fetal heart rate pattern.

43.      Defendant Youngblood was in the bathroom at the time and witnessed Tiffany's water break. Defendant Youngblood alerted her supervisor Defendant Van Reil about what she witnessed. Rather than getting assistance for Tiffany, Defendant Van Reil ordered her back to her bay, telling her that her water had not broken and she "must have peed" on herself. Defendant Van Reil repeatedly denied that Tiffany was in labor despite Defendant Youngblood's observations and Tiffany's insistence that she was in labor and needed urgent medical assistance.

44.      Another woman detained at the jail, Jade O'Bryan, announced over the speaker that Tiffany's water had broken and that she needed help. No HCJ official came to Tiffany's aid.

45.      When no one from the jail came to help Tiffany despite her obvious signs of labor, Nathina Whitaker, another detained woman, sat on the floor with Tiffany and told her she would

---

[2] Risks of PPROM include early delivery of the baby and serious infection of the placental tissues, which can be very dangerous for both the mother and the baby. *See* Am. Coll. of Obstetricians & Gynecologists' Comm. on Prac. Bulls., *ACOG Practice Bulletin: Prelabor Rupture of Membranes*, 135 OBSTETRICS & GYNECOLOGY e80, e81 (2020) ("The most significant risks to the fetus after preterm PROM are complications of prematurity," including "[r]espiratory distress," "an increased risk of neurodevelopmental impairment," and other complications such as sepsis.).

not leave her side. Ms. Hansberry joined Ms. Whitaker, and the two women kept watch over Tiffany.

46.    Ms. Whitaker told Tiffany to let her know if she was in pain or if contractions started. She had Tiffany turn onto her side to enable better blood flow to her uterus, at which point Tiffany fell asleep. Ms. Whitaker woke Tiffany every thirty minutes to check on her.

47.    Just before shift change at 6:00 a.m., Defendant Youngblood checked on Tiffany. She thanked Ms. Whitaker and Ms. Hansberry for sitting with Tiffany and told them to use the speaker button if they needed to call an officer. Ms. Whitaker told Defendant Youngblood that Tiffany's water had definitely broken because it was slimy and all over the floor in a trail straight from the bathroom, and Defendant Youngblood replied that she was aware because the fluid was on the bottom of her shoes, and she could smell it.

48.    Defendant Youngblood told Ms. Whitaker that she had notified Defendants Smoak (the physician assistant at the HCJ) and Van Ackern (the nurse) that Tiffany's water had broken, and that they would be there shortly to check on her. When Ms. Whitaker asked Defendant Youngblood why she would not call 911, Defendant Youngblood told her she was not allowed.

49.    Even though it had become common knowledge throughout the jail that Tiffany's water had broken, no medical staff came to O-Pod to evaluate her. Multiple staff members, including Defendants Trawick, Bishop, Van Ackern, and Johnson, documented that Tiffany's water had broken, but none acted.

> ii.    **May 26, Approximately 7 a.m.: Defendants Ignore Ms. McElroy's Labor and Abnormal Fetal Heart Tones and Provide Her with Only a Diaper and Tylenol.**

50.    Later that morning, Defendant Bishop came to O-Pod to bring Tiffany to the medical clinic. Ms. Whitaker helped Tiffany to the door and explained to Defendant Bishop that

11

her water had broken. She requested to help Tiffany to the nurse station, but Defendant Bishop refused.

51.     Even though Tiffany was in labor and in increasingly severe pain, Defendant Bishop failed to give her a wheelchair and forced her to walk unassisted to the jail's medical clinic. Defendant Van Ackern acknowledged that Tiffany walked to the clinic clutching her abdomen and bending over in pain.

52.     At the clinic, Tiffany described pain in her lower abdomen since her water had broken and let Defendant Van Ackern know that her other babies had been born a couple of weeks early. Throughout the entire clinic visit, Tiffany continued to leak fluid—Defendant Van Ackern responded by providing Tiffany with a diaper. Later in the visit, Defendant Van Ackern checked the diaper and saw it was stained with yellowish-grey discoloration. Defendant Van Ackern checked the fetal heart tones, which registered at 166, above the normal range.

53.     Despite the unmistakable evidence that Tiffany was in active labor and in pain, Defendant Van Ackern failed to test her amniotic fluid or take any other steps to determine the cause of the "mucusy gush" Tiffany had reported to staff. Nor did Defendant Van Ackern, having just established that the fetus had abnormal heart tones, send Tiffany to the hospital or call for emergency medical care, such as an ultrasound and fetal monitoring. Instead, Defendant Van Ackern put Tiffany in a diaper and a clean jumpsuit, gave her Tylenol, and sent her back to the pod to rest.

54.     She then informed Defendant Smoak about the visit and noted that Tiffany should receive extra food, an extra mat, and Tylenol according to the jail's protocol for pregnant women. Defendant Smoak likewise made no effort to meet even the most basic standard of care by arranging emergency medical care.

12

55.    Following this perfunctory evaluation, Tiffany returned to O-Pod and lay down, per Defendant Van Ackern's instructions. Ms. Whitaker asked Tiffany if HCJ staff were taking her to the hospital, and Tiffany told her no.

### iii.    May 26, Approximately 8 a.m. to 5 p.m.: Defendants Refuse Repeated Requests for Assistance or Accommodations and Force Ms. McElroy to Move about the HCJ Unassisted.

56.    Around 8:00 a.m., *while Tiffany was still in labor,* HCJ staff called her out for first appearance in her criminal case in the jail's courtroom. HCJ staff forced her to walk to the courtroom unassisted, despite Tiffany struggling to do so.

57.    When Tiffany returned from her first appearance, HCJ staff made her stand in line for her lunch tray and once again refused to allow other women to provide help and assistance. When Tiffany asked for an extra tray of food, the officer refused, again in violation of HCJ protocols regarding pregnant women.

58.    While Tiffany was in line, Ms. Whitaker took Tiffany's mat to an officer and pointed out that it was soaking wet from Tiffany's water breaking and her amniotic fluid leaking. The officer told Ms. Whitaker that Tiffany was only a couple of months pregnant, that her water had not broken, and that she just had a bad infection that had leaked all over the floor. Ms. Whitaker told the officer that this was Tiffany's sixth pregnancy and that she was in her third trimester, but the officer insisted that Tiffany was too small and that she "gets high" so she does not know what she is talking about. The officer did nothing to seek medical attention or provide medical care to Tiffany to treat the supposed "bad infection."

59.    Ms. Whitaker also asked the officer if Tiffany could have an extra tray of food because she was really hungry. But the officer refused again, so Ms. Whitaker gave Tiffany her own tray. Ms. Whitaker also went without a mat so she could give Tiffany hers.

60.    Tiffany's pain continued to escalate, rippling from her back to her stomach and to her back again.

61.    After lunch, jail staff evacuated the entire pod, including Tiffany, to the gym to conduct a pod search. The staff failed to provide Tiffany with a wheelchair or any other accommodation, again forcing her to walk. While jail staff searched the pod, Tiffany lay down on the cold floor of the gym and curled up into a ball, where she stayed for about 45 minutes. By this point, the fluid leaking from Tiffany was severe.

62.    The women returned to O-Pod from the gym only to discover that the officers had ransacked it. An officer told the women that they had until 6:00 p.m. to scrub all the toothpaste off the walls of every bay, or else be put on modified cell restriction, a form of punishment. Women detained in the HCJ had long been using toothpaste to hang items on the walls, and it had been there for years. An officer forced Tiffany out of bed so that Ms. Whitaker could scrub toothpaste off the wall around her bunk.

63.    While the women were made to clean the walls around her, Tiffany slipped in and out of consciousness. As she tried to sleep, the increasingly painful contractions made her repeatedly scream out in pain as each new wave hit.

64.    Around 4:30 p.m., staff once again forced Tiffany to stand in line for dinner. By this point, the entirety of the HCJ staff was aware that Tiffany's water had broken and that she was in labor, but they still refused to allow the other women to help her by getting her tray for her.

        **iv.    May 26, Approximately 5 p.m. Until the Early Morning of May 27: Ms. McElroy Labors Through the Night While Defendants Ignore Repeated Pleas for Medical Attention and Threaten the Women Who Are Helping.**

65.    As Tiffany's labor progressed into the evening in O-Pod, HCJ staff continued to demonstrate utter indifference to her increasingly urgent condition. Throughout the night of May

14

26 and into the early morning of May 27, Ms. Whitaker and Ms. Hansberry remained fixed by Tiffany's side as she labored. Other women detained in the jail repeatedly alerted jail staff to the emergency, including by pushing the emergency call button and by yelling for help, but jail staff rarely responded. Defendants made no effort to monitor the progress of Tiffany's labor or seek any kind of emergency medical assessment or assistance.

66. At some point in the night, Tiffany moved into a boat bed—a plastic shell bed on the floor. After that, Ms. Hansberry sat on Tiffany's bottom bunk, and Ms. Whitaker brought her mat over and put it on the floor next to Tiffany, so that Tiffany was situated between them.

67. In the early morning of May 27, Tiffany's contractions began to intensify. The other women in O-Pod heard her screaming out in pain. Tiffany's screaming was so loud that it woke up multiple women who had been sleeping on the top level of O-Pod.

68. Around 1:00 or 2:00 a.m. on May 27, Tiffany began to feel the urge to start pushing. Ms. Hansberry woke Ms. Whitaker, who had been sleeping on her mat on the floor next to Tiffany, and told her it was time. Tiffany was sitting up and rocking back and forth in severe pain. She told the others, "I'm not okay, I'm hurting like hell."

69. Tiffany's contractions were now coming around three minutes apart. The other women helped her to remove her jumpsuit and felt her abdomen hardening and then going soft. Tiffany asked the other women to call her a doctor. Ms. Whitaker hit the speaker button and once again asked Defendant Youngblood, who had returned for another shift, to call 911.

70. Defendant Youngblood entered O-Pod and asked Tiffany if she was okay. Tiffany said she was not and again pleaded to be taken to the hospital. Defendant Youngblood asked Tiffany to stick her fingers inside herself to see if she could feel the baby's head. Tiffany yelled

15

through her excruciating pain that she could not do so and that Defendant Youngblood should call her a doctor and 911.

71.    Tiffany allowed Ms. Whitaker to check for the baby's head using her fingers, but Ms. Whitaker could not feel it.

72.    Defendant Youngblood spoke to Defendant Van Reil about Tiffany's escalating contractions, and though Defendant Van Reil checked on Tiffany while she was screaming in pain, she failed to provide any assistance. Not only that, but she explicitly ordered Defendant Youngblood *not* to help Tiffany, telling Defendant Youngblood that she and the jail could be held accountable if anything happened to Tiffany or her baby.

73.    By this point, other women had gotten out of bed to try to help Tiffany. They banged on the doors to get the guards' attention and pleaded with them for help, to no avail.

74.    Ms. Hansberry held Tiffany's head while Ms. Whitaker held Tiffany's legs up to prepare for delivery. Some guards, including Defendant Van Reil, entered the pod and demanded that Ms. Whitaker stop assisting Tiffany, yelling that she did not know what she was doing. The guards ordered Ms. Whitaker to put Tiffany's legs down. Ms. Whitaker cried out that the baby was coming. Defendant Van Reil again denied this unassailable fact and threatened to tase Ms. Whitaker if she touched Tiffany's legs again.

75.    Jail officers yelled at the other women in O-Pod to get back to their bunks. Some women refused because they wanted to help Tiffany. At this point, staff had turned on the lights, and many women, including Tiffany, continued screaming for a doctor and for someone to call 911. Defendant Van Reil told the women to get back to their bays and get away from Tiffany or be put on lockdown.

16

76. Ms. Whitaker explained to Defendant Van Reil that she had been sitting with Tiffany for nearly 24 hours, that Tiffany's water had broken, and that Tiffany was in active labor. Defendant Van Reil ordered Ms. Whitaker to get back to her bunk or face lockdown. Ms. Whitaker refused to leave Tiffany's side despite these threats. Defendant Van Reil became angry and yelled at Ms. Whitaker to move, so Ms. Whitaker went to sit on a bunk with Ms. Hansberry in the same bay.

77. Defendants Creech, Burse, Hammond, and another male guard came into the bay with Defendant Van Reil and ordered Tiffany to put her clothes on, including the diaper, and get into a wheelchair. Tiffany hunched over and hobbled to the wheelchair while Defendant Van Reil commented to the other officers, "Look, she can walk. She ain't in labor because if she was, she wouldn't be walking."

78. But Tiffany was moaning and screaming in agony as the officers rolled her into the hallway. Once again, Ms. Whitaker and Ms. Hansberry urged the officers to take Tiffany to a hospital.

79. Defendants Van Reil, Creech, Burse, Hammond, and another guard took Tiffany's vital signs. Despite all evidence to the contrary, they informed Tiffany she was fine and not in labor and returned her to the bay shortly after. For all Tiffany's agony, Defendant Van Reil provided her with only two Tylenol per Defendant Smoak's order.

80. Officers turned off the lights and left.

81. Another detained woman, Cari Hooks, who had nursing experience, wanted to help Tiffany. She saw the vitals monitor in the bay and picked it up to take Tiffany's blood pressure. Defendant Van Reil entered the bay and asked Ms. Hooks what she was doing. When Ms. Hooks explained that she was trying to provide medical attention to Tiffany, Defendant Van Reil asked

17

Ms. Hooks for her name and told her they did not "need no jailhouse nurses." Even though Ms. Hooks explained that she had experience, Defendant Van Reil pulled out her taser and told Ms. Hooks to "get back to your fucking bay or I'll tase you."

82.     Defendant Youngblood returned, this time in tears. Ms. Whitaker again asked Defendant Youngblood to call 911, but she said she was forbidden to do so. Defendant Youngblood told Ms. Whitaker and Ms. Hansberry to return to their assigned areas, but Ms. Whitaker refused. Before leaving, Defendant Youngblood told Ms. Whitaker she would have to write her up and said that she herself had already been written up by her superiors for trying to help Tiffany.

83.     Returning a second time, Defendant Youngblood once more tried to send Ms. Whitaker to her assigned area for lockdown, but Ms. Whitaker again refused to leave Tiffany's side.

84.     Tiffany continued to scream through increasingly intense and close-together contractions.

85.     About twenty minutes later, Tiffany's contractions began to slow, and the women became worried that something was wrong with the baby. Tiffany was terrified that her baby could get stuck in her birth canal and would not survive. Ms. Whitaker and Ms. Hansberry continued sitting with Tiffany and tried to comfort her. The other women were saying that it was too late, the baby was dead. Ms. Whitaker held Tiffany as she slept and moaned.

18

v.      **May 27, Approximately 3:30 a.m.: Ms. McElroy Gives Birth with No Medical Assistance or Medication.**

86.     Tiffany felt like her body was ejecting the baby, and her pain was like a ring of fire.[3] Ms. Whitaker held her upright and forward as Ms. Hansberry held her legs apart. Tiffany was crying in agony. As her contractions continued, Tiffany feared that she would not be able to give birth and that her baby would die.

87.     Ms. Whitaker encouraged her to push and told her, "Tiffany, you have to push out a baby whether it's dead or alive if you don't want to die, but I think it's alive and you have to keep pushing." Tiffany was screaming and grunting, and her lips had turned purple. Tiffany held Ms. Whitaker's hand as she lay on the floor with her eyes closed.

88.     Defendant Youngblood again called Defendant Van Reil for help. Defendant Van Reil merely responded that Tiffany could "see [Defendant Smoak] in the morning when he got in"—which would be several hours later.

89.     The baby began to crown. Ms. Whitaker continued to assist Tiffany and encouraged her to keep pushing until she and Ms. Hansberry could pull the baby out. Ms. Whitaker yelled that the baby was coming, they needed help, and to call 911. Many women had gathered outside the bay, clapping, yelling, and beating on the tables and windows to get the guards' attention as they were hitting the speaker button.

90.     Other women in the pod, including Sarita Piña, Xaviera Smith, and Cindy McIntyre, could also see that Tiffany was crowning. When Ms. Piña saw the baby's head begin to emerge, she shouted to everyone that Tiffany was about to have her baby. Ms. Piña pushed the

---

[3] Crowning is often referred to as the "ring of fire" during the birthing process. At this juncture, the cervix is fully dilated, and the baby's head becomes visible in the birth canal. Some women feel an intense burning or stinging sensation. *See* Ashley Marcin, *Baby Crowning: Everything You Want to Know but Are Afraid to Ask,* HEALTHLINE (Aug. 9, 2019), https://www.healthline.com/health/pregnancy/baby-crowning#how-it-feels.

emergency button on the wall to call the guards and encouraged Tiffany to keep pushing as Ms. Whitaker and Ms. Hansberry assisted her delivery.

91.    Tiffany herself repeatedly yelled that the baby was coming.

92.    The officers continued to ignore the women's collective pleas. At some point, the guards even brought breakfast trays to the door while refusing to acknowledge the active scene of Tiffany in the midst of giving birth, surrounded by women.

93.    Tiffany pushed until Ms. Hansberry could gently pull the baby from the birth canal as other women in O-Pod—including Dana Yeomans, Ms. Worthington, Ashley Shavers, and Rebecca Cook—entered Tiffany's bay and watched the delivery of Baby B.T.

94.    Tiffany gave birth around 4:00 a.m. She did so without any medication or medical assistance. Although Tiffany had given birth before, she had received an epidural each time; this was her first unmedicated birth, and it was not by choice. This unmedicated labor was the most terrible pain Tiffany has ever felt. For over five hours, she felt as though every bone in her body was breaking and her body was slowly being pulled apart.

> **vi.    May 27, Approximately 4 a.m.: Ms. Whitaker and Ms. Worthington Resuscitate Baby B.T. after She Is Delivered Not Breathing.**

95.    When Baby B.T. emerged, she was not crying or breathing, and she looked limp and blue. Tiffany was terrified that her baby would die.

96.    Some of the women, including Ms. Hooks and Ms. Worthington, yelled to get the mucus out of the baby's mouth so she could breathe. Ms. Hansberry wiped the baby's face with a towel and Ms. Whitaker tried to remove the mucus from the baby's mouth with her hand, but when this failed, someone suggested sucking the mucus from the baby's mouth instead.

20

97.    Ms. Whitaker then carefully put the baby up to her mouth and started sucking fluids from the baby's mouth. Ms. Whitaker was crying and shaking as she saw the baby's eyes and mouth open.

98.    Ms. Worthington came to help and took the baby from Ms. Whitaker. The umbilical cord came loose, and Ms. Whitaker said to put pressure on the baby's stomach and wrap her in a towel. Ms. Hansberry handed Ms. Worthington a towel to stop the bleeding where the umbilical cord had come loose. Ms. Worthington used her mouth to suction the baby's mouth and nose three times and stimulated her chest, and the baby started breathing. Ms. Worthington patted the baby on the back, and finally, the baby began to cry.

99.    The whole time, Tiffany was yelling, "My baby, my baby!"

100.    All the women in O-Pod started yelling and screaming at the one-way glass of the officers' booth. Ms. Piña shouted for help and was beating on the glass and metal table so hard that her hands hurt. Several minutes went by with the women beating on the tables and windows.

101.    The officers sitting in the booth watched Tiffany's entire harrowing delivery unfold in plain view and in real time. Defendant Youngblood watched them in O-Pod from a table while Defendant Hammond watched from a desk.

102.    It was not until the women delivered Baby B.T. that Defendants—including officers D. Hayder, A. Hayder, Van Reil, Moreno, Marcus, and Creech—finally came into the bay. As the officers entered, they yelled at the women to move out of the way and announced that everyone was on lockdown. Defendant Van Reil told the women that they would all be put on modified cell restriction. Defendant D. Hayder took Baby B.T. from Ms. Worthington's arms and wrapped her in blankets. Defendant Van Reil tied up the baby's umbilical cord with a string they had on hand.

103.    For several minutes, no one offered Tiffany or Baby B.T. any physical assistance.

104.    Tiffany did not deliver her placenta in the jail. Ms. Worthington encouraged her to push out the placenta, but Tiffany seemed to be in shock and was unresponsive.

105.    Tiffany was still in her boat bed on the floor when Defendants Moreno, Creech, and A. Hayder eventually took her off the ground and put her in a wheelchair. Tiffany asked Ms. Whitaker to call her mother. Ms. Whitaker said that she would and told Tiffany that she was proud of her, wished her good luck, and said that she would see her in a few days.

106.    With Tiffany still in intense pain, the officers took her and Baby B.T. out of the bay.

### vii.    May 27, Immediately After the Birth: Defendants Punish the Women of O-Pod for Helping Ms. McElroy.

107.    After Tiffany was wheeled out, Defendant A. Hayder yelled at Ms. Whitaker, told her how "stupid" she was, and asked if she was "fucking retarded." Ms. Whitaker responded that she was not stupid, but rather "y'all just failed to do y'all's job and I just delivered a baby." Defendant Marcus admonished Ms. Whitaker to "stop arguing back."

108.    Later, Defendant D. Hayder and another officer came back to the pod and demanded to know who had delivered the baby. Defendant D. Hayder threatened the women with criminal charges if anything was wrong with the baby. Defendant Hammond said to the women of O-Pod: "Y'all should've pushed that motherfucking baby back in."

109.    Defendants wasted no time in punishing the women of O-Pod for helping Tiffany deliver her baby. Jail staff put everyone on modified cell restriction for several days after Tiffany gave birth. This meant that the women were confined to their bunks all day and were not allowed to leave, except for one hour per day and to use the bathroom. They could not go to church or go outside for fresh air. They also had no phone access for several days.

110.    Through their actions and inactions, Defendants Bishop, Burse, Creech, Grace, Hammond, D. Hayder, A. Hayder, Johnson, Marcus, Moreno, Murphy, Roberts, Smoak, Trawick, Van Ackern, Van Reil, and Youngblood violated Tiffany's constitutional rights by forcing her to endure an excruciatingly painful and dangerous labor for over 24 hours without adequate pain medication or medical treatment. Defendants failed to provide Tiffany with emergency medical care despite her obvious signs of labor and ultimately forced her to deliver Baby B.T. in the jail without any medical assistance. Defendants ignored and belittled Tiffany's repeated cries for help. By denying Tiffany necessary medical care throughout her labor and delivery, Defendants were deliberately indifferent to Tiffany's and Baby B.T.'s serious medical needs and, on information and belief, violated HCJ policies and protocols governing care for a detained pregnant woman.

## II.    Defendants' Deliberate Indifference Caused Ms. McElroy Significant Emotional and Physical Harm and Put Baby B.T.'s Life at Risk.

111.    Defendants' deliberate indifference throughout Tiffany McElroy's pregnancy, labor, and delivery caused her severe psychological, emotional, and physical injury.

112.    After delivering Baby B.T., Tiffany was transported to Southeast Health hospital, where she was admitted at 4:47 a.m. on May 27. Baby B.T. was transferred to the neonatal intensive care unit ("NICU"). More than 24 hours after her water broke, Tiffany and her newborn daughter finally received medical care. Medical staff assisted Tiffany as she delivered the placenta, and her pain finally began to improve.

113.    Once at the hospital, the impact of Tiffany's labor and delivery—including issues exacerbated by the lack of medical attention and treatment during her labor and delivery at HCJ— became clear.

114.    Tiffany lost so much blood during her delivery in the jail that she was diagnosed with anemia associated with acute blood loss and met criteria to receive an iron transfusion.

23

115.    Tiffany was also diagnosed with acute chorioamnionitis and funisitis following an analysis of her placenta. Chorioamnionitis is a serious bacterial infection of the placental tissues and amniotic fluid, typically occurring during pregnancy or labor. It is often caused by bacteria rising from the vagina, particularly when the amniotic sac is ruptured for a prolonged period, and it causes symptoms like fever and rapid maternal/fetal heart rates that can cause life-threatening complications for both mother and baby, including sepsis and brain or lung problems in the fetus. To avoid greater risks associated with infection, pregnant women like Tiffany who exhibit symptoms of chorioamnionitis—including vaginal discharge and an elevated white blood cell count—are typically treated with antibiotics, and labor is induced. The risk of infection spreading beyond the uterus increases the longer a woman is in labor—in other words, women who present with chorioamnionitis must be treated and should deliver immediately to avoid risk of infection spreading throughout the body. Tiffany received no such treatment. Funisitis refers to inflammation in the umbilical cord and is often associated with chorioamnionitis. It poses risks of both short- and long-term complications, including sepsis and cerebral palsy, and can be life-threatening.[4]

116.    Because of her condition and the toll wrought on her by the physical traumas of the delivery, Tiffany had to spend three days at the hospital before she was returned to the jail.

117.    Defendants' refusal to provide assistance throughout Tiffany's labor and delivery endangered Tiffany's life and caused her to believe that she would die during the labor and delivery.

118.    Tiffany's experience of being forced to give birth in the jail without medication or medical assistance was incredibly traumatic, causing her severe emotional distress from having to

---

[4] Chong Jai Kim et al., *Acute chorioamnionitis and funisitis: definition, pathologic features, and clinical significance*, 213 AM. J. OBSTETRICS & GYNECOLOGY S29, S29-30 (2015).

24

endure over 24 hours of unnecessary, agonizing physical pain, worse than anything she had ever felt, to facing the fear and despair of her jailers actively interfering with the modicum of care her peers were able to provide.

119. Defendants' refusal to provide assistance throughout Tiffany's labor and delivery endangered Baby B.T.'s life and caused Tiffany to believe that she and her baby would both die during the birth.

120. Tiffany experienced severe emotional distress as she labored for hours without medical aid, including through periods when her contractions slowed and it seemed that her baby was dying. Tiffany witnessed Baby B.T. born unresponsive, not crying or breathing, with her survival attributable only to the quick thinking and support of the women detained with Tiffany, who worked together not only to help her throughout a complicated labor but also to resuscitate her newborn infant.

121. Her emotional distress continued, however, even after being taken to the hospital, as her newborn daughter had to receive intensive care in the NICU.

122. Tiffany also experienced significant postpartum depression, exacerbated by her excruciatingly painful birth experience and mistreatment by jail staff.

123. She also felt devastated to be immediately separated from Baby B.T. and denied the opportunity to provide her with breast milk as well as enjoyment of the critical "Golden Hour"[5] after the birth.

---

[5] "The Golden Hour encompasses a set of evidence-based practices that contribute to the physiologic stabilization of the mother-newborn dyad after birth. Important elements of the Golden Hour include delayed cord clamping, skin-to-skin contact for at least an hour, the performance of newborn assessments on the maternal abdomen, delaying non-urgent tasks (e.g., bathing the newborn) for 60 minutes, and the early initiation of breastfeeding. The Golden Hour contributes to neonatal thermoregulation, decreased stress levels in a woman and her newborn, and improved mother-newborn bonding. Implementation of these actions is further associated with increased rates and duration of breastfeeding." Jennifer L. Neczypor & Sharon L Holley, *Providing Evidence-Based Care During the Golden Hour*, 21 NURSING FOR WOMEN'S HEALTH 462, 462 (2017).

124.    Tiffany continues to experience significant emotional distress, trauma, and fear as a result of Defendants' conduct. She is terrified of becoming pregnant and giving birth again, fearing that she could be subjected to the same pain and mistreatment in the future and be placed once again at risk of losing her life. In addition, Tiffany has experienced disorienting lapses in memory and endured recurring nightmares that her baby is dying.

125.    These physical, psychological, and emotional injuries are a direct result of Defendants' actions and inactions, which amount to cruel and deliberate indifference to Tiffany's serious medical needs and the needs of Baby B.T.

### III.    Defendants' Conduct, Policies, Customs, and Practices Caused Ms. McElroy and Baby B.T. Needless Suffering and Injury.

126.    Because of Houston County's unusually high rate of detaining pregnant and postpartum women, it was particularly foreseeable and plainly obvious that Defendants' deliberate indifference to the serious medical needs of such people would lead to breaches of care and needless pain, suffering, and injuries. Nearly half of all pregnancy-related arrests throughout the United States from 2006 to 2022 took place in Alabama.[6] Further, from June 2022 to June 2023, nearly half of all pregnancy-related prosecutions recorded in the United States originated in Alabama.[7] Indeed, between 2015 and January 2023, Houston County had one of the highest numbers of chemical endangerment cases per capita in the state.[8] Accordingly, Houston County's

---

[6] Purjava S. Kavattur et al., *The Rise of Pregnancy Criminalization: A Pregnancy Justice Report*, Pregnancy Justice, 17, 19 (2023).

[7] Pregnancy Justice, *Alabama: The State of Pregnancy Criminalization in the First Year After Dobbs*, 1 (2025), https://www.pregnancyjusticeus.org/resources/alabama-post-dobbs/.

[8] From 2015 to January 2023, Houston County recorded 508 chemical endangerment cases in district court. Fifty-six percent of those cases were for women. *See* Amy Yurkanin, *One Alabama county cracked down on pregnancy drug users. 10 years later, has it gone too far?*, AL.com (July 31, 2023), https://www.al.com/news/anniston-gadsden/2023/07/one-alabama-county-pledged-to-crack-down-on-pregnant-drug-users-ten-years-later-has-it-gone-too-far.html.

need to provide medical care to pregnant and postpartum women is not a rare or isolated incident; it is a routine and ongoing reality.

127. Defendants Houston County and Sheriff Valenza have established policies, customs, and practices concerning medical care for people detained at the HCJ that reflect deliberate indifference to serious medical needs. Those policies, customs, and practices include delaying, denying, or providing plainly inadequate medical care, including to pregnant women. As detailed below, relevant policies, customs, and practices include, but are not limited to, failing to send individuals to external medical providers or provide adequate medical care within the HCJ, even in emergency and life-threatening situations, including during labor and delivery.

128. Defendants had knowledge of and were on notice that the policies, customs, and practices of delaying or denying necessary medical care for individuals in their custody, including pregnant women, were at issue, from the previous claims and grievances filed by individuals detained at the HCJ, their own observations, and common sense.

**A.      Defendants Have a History of Failing to Provide Adequate Medical Care for People Who Are Detained at the HCJ While Pregnant or Postpartum.**

129. Defendants have a history of failing to provide adequate medical care for pregnant and postpartum women detained at HCJ. In recent years, pregnant and postpartum women at the HCJ have experienced and continue to experience inadequate medical care and deliberate indifference to their serious medical needs.

130. One such example is Heather Shirah. In April 2023, while she was four or five months pregnant, Ms. Shirah requested medical attention while detained at the HCJ because she was concerned that injuries she sustained during her arrest may have harmed her fetus.

131. Upon information and belief, HCJ medical staff checked the fetal heartbeat, which was irregular. Despite this irregular finding, they failed to take Ms. Shirah to the hospital. Instead,

27

upon information and belief, HCJ medical staff told Ms. Shirah that there was a protocol in place and that they could not take her to the hospital, despite Ms. Shirah indicating she was experiencing pain akin to labor. They gave Ms. Shirah Tylenol for the pain.

132. Over the next three days, Ms. Shirah suffered intermittent hemorrhage and was not provided any medical care or attention. During this time, Ms. Shirah and other detained individuals present pleaded for help from HCJ staff, who ignored them.

133. Ms. Shirah suffered a miscarriage on the floor of the HCJ without medical assistance.

134. Following the traumatic miscarriage, which resulted in a multi-day hospitalization, Ms. Shirah returned to the HCJ where her poor and inadequate treatment continued. Upon information and belief, HCJ officials refused her access to menstrual pads despite continued blood loss. Instead, staff forced Ms. Shirah to use a rag to wipe away any blood. Because of the persistent bleeding, Ms. Shirah was forced to walk around the facility with a blanket wrapped around her waist.

135. By failing to take remedial measures after incidents like this in which HCJ officials failed to provide adequate medical care to women in active labor and failed to provide adequate postnatal care, Defendant Houston County Commission showed deliberate indifference to the serious medical needs of pregnant women in their care, as well as their babies once born, and therefore bear responsibility for the later unconstitutional failure to provide adequate medical care to Tiffany in 2024.

**B.      Defendant Houston County Woefully Underfunds HCJ Medical Care.**

136. Under Alabama law, the Houston County Commission is required to pay medical expenses for individuals in detention. Until 2017, however, individuals detained in Houston County had been treated at Southeast Health, a healthcare system in Dothan, Alabama, at no charge

28

to the county. In 2017, that policy changed, and Southeast Health began charging the Houston County Commission for these medical expenses.

137.    In the following years, Houston County and Southeast Health reached an agreement for the county to pay Medicare rates for detained individuals who received special medical attention at Southeast Health's hospital—while Houston County officials expressed concern that the county could not take on increased medical expenses.[9]

138.    At the time of this agreement, Houston County Commissioner Brandon Shoupe stated that some of the bills he had seen for detained individuals were upwards of $60,000. Commissioner Shoupe expressed concerns that paying for this medical care would impact the county budget in both the short and long term and could bankrupt the county.[10]

139.    Despite these reportedly high medical expenses for detained individuals, the total Houston County budget for medical and dental expenses for people in detention in 2023 and 2024 was only $125,000.[11] This budget covers the general medical expenses for the approximately 450 people that Houston County typically detains.[12] This astonishingly low amount leaves very little funding, if any, to pay for additional medical expenses like hospital stays or charges. Indeed, Houston County's projected medical and dental expenses for detained individuals for 2023 and 2024 were more than $26,000 greater than its budget for the same period. Further, the Houston County Commission incentivizes and awards employees for "spending efficiency," which includes

---

[9] Sarah Drake, *Houston County Commission to pay for inmate medical expenses*, WDHN (Mar. 25, 2019), https://www.wdhn.com/news/local-news/houston-county-commission-to-pay-for-inmate-medical-expenses.

[10] Randi Hildreth, *Houston County, Southeast Health work towards agreement for inmate medical costs,* WSFA (Mar. 25, 2019), https://www.wsfa.com/2019/03/26/houston-county-southeast-health-work-towards-agreement-inmate-medical-costs.

[11] Houston    Cnty.    Comm'n,    FY    2024-2025    Budget    (Oct.    2024), https://houstoncountyal.gov/files/budgets/budget_fy2425_budget_97083.pdf.

[12] Christian Jones, *Five-year plan maps out Houston County jail expansion and renovation,* WDHN (Mar. 14, 2024), https://www.wdhn.com/news/local-news/five-year-plan-maps-out-houston-county-jail-expansion-and-renovation.

finding ways to cut medical costs that the County is required to pay.[13] Defendant Smoak was a recipient of this award.[14]

140. By failing to adequately fund HCJ medical care, Defendant Houston County bears responsibility for the unconstitutional failure to provide adequate medical care to Tiffany and Baby B.T. in 2024.

## C. Defendants Have Been on Notice about Medical Care Deficiencies at the HCJ for Decades.

141. The HCJ has a long history of failing to provide adequate medical care. As early as 1978, a district court found that "[t]he minimum elements of an adequate medical care program for inmates of the Houston County Jail are totally lacking."[15] In the nearly fifty years since, the HCJ has refused to remedy its deficient medical care practices, causing countless individuals to suffer untold harm.

142. Officials at the HCJ, including named Defendants, have been the subject of dozens of federal lawsuits regarding denial of medical care since 2011.

143. One such case, filed in 2011, concerned Jonathan McCall, who died in the HCJ on July 13, 2009, after medical staff failed to provide him with medical care for a twisting of the large intestine, a condition that causes immense pain and which likely could have been addressed if Mr. McCall had received medical attention.

144. Mr. McCall exhibited unusual behavior in the days leading up to his death, including refusing to eat and exhibiting signs of severe distress. On the day of his sudden death, correctional officers at multiple points noted that Mr. McCall appeared unconscious or

---

[13] Houston Cnty., Spending Efficiency Program, Houston County, Ala. https://houstoncountyal.gov/administration/spending_efficiency_program.
[14] *Minutes of the Houston County Commission, Regular Session, Feb. 14, 2022*, Houston Cnty., Ala., https://houstoncountyal.gov/files/meetings/2022-02-14_minutes_commission_meeting_24485.pdf.
[15] *Adams v. Mathis*, 458 F. Supp. 302, 306 (M.D. Ala. 1978).

unresponsive. Despite Mr. McCall's increasingly troubling behavior, medical personnel neglected to examine him in the roughly two weeks prior to his death.

145.    It was not until other individuals detained at the facility alerted correctional officers that Mr. McCall appeared unresponsive and severely ill that jail staff provided Mr. McCall medical attention. Mr. McCall was pronounced deceased later that evening. The provision of CPR was the first time a medical provider attended to him. The 2017 funding policy change requiring Houston County to pay Southeast Health for detained individuals' medical care only exacerbated the deficiencies in medical care, particularly in emergency situations.

146.    For example, a federal complaint filed in January 2023 described the events leading to the sudden death of James Hinson, who began displaying severe signs of illness—including severe abdominal pain, vomiting blood, rapid heart rate, and a fever—shortly after his arrest.

147.    Despite these obvious signs of distress, HCJ personnel failed to send Mr. Hinson to the hospital for emergency medical care. His condition, which the complaint alleges was a perforated ulcer, led to his death.

148.    Upon information and belief, other detained individuals have suffered at HCJ due to deficient medical care following the medical care funding policy change in 2017. According to a November 2017 complaint, one such example included an individual who received inadequate care after experiencing a seizure at the HCJ. According to the complaint, HCJ staff did not call emergency services or 911 for this seizure incident, but instead merely prescribed ibuprofen.

149.    Numerous additional complaints similarly demonstrate the HCJ's pattern of failing to provide medical care. A federal complaint filed in 2018 describes an incident in which a detainee fell from the second story balcony of the jail and the HCJ denied him any medical treatment for

31

four days, at which point the detainee was admitted to the emergency room with a fractured skull and brain damage.

150.    Another complaint, filed October 3, 2022, alleges that, despite knowledge of the detainee's chronic medical condition, the HCJ failed to provide adequate medical treatment, causing *E. coli* and bladder stones that ultimately required surgery and hospitalization.

151.    The HCJ exhibited a similar pattern of failing to provide medical care even in the days leading up to Tiffany's delivery. For example, Amber Harris, who ultimately witnessed Tiffany give birth on May 27, was experiencing pain from three fractured ribs when she arrived at the HCJ on May 20. Despite her requests for medical attention, jail staff denied Ms. Harris medical care for three days as she remained in O-Pod in pain.

## CLAIMS FOR RELIEF

### Count I

**Plaintiffs Tiffany McElroy and Baby B.T.**
**42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Needs**
**(Fourteenth Amendment)**
**Against Defendants Bishop, Burse, Creech, Grace, Hammond,**
**D. Hayder, A. Hayder, Johnson, Marcus, Moreno, Murphy, Roberts,**
**Smoak, Trawick, Van Ackern, Van Reil, Youngblood**

152.    Plaintiffs re-allege and incorporate by reference paragraphs 33–125 above.

153.    The U.S. Constitution requires that officials ensure that detained individuals receive adequate food, clothing, shelter, and medical care. Deliberate indifference to the serious medical needs of a person detained pretrial violates the Due Process Clause of the Fourteenth Amendment. Defendants named in Count I, acting under color of state law, inflicted, or caused to be inflicted, cruel and unusual punishment upon Ms. McElroy and Baby B.T. in violation of the Fourteenth Amendment.

154. As described in Section I above, Defendants had knowledge of Ms. McElroy's medical needs and the seriousness of those needs, and they knew the risk of harm she and Baby B.T. faced if she did not receive appropriate medical care. Despite that knowledge, Defendants acted with deliberate indifference and failed to provide Ms. McElroy with proper medical care or access to medical care over the course of her pregnancy and during delivery on or around May 23 to May 27, 2024. Defendants also acted with deliberate indifference when they failed to provide Baby B.T. with medical attention upon her birth. As a direct result of this willful inaction, Ms. McElroy experienced unnecessary pain, suffering, and injury as a consequence.

155. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and/or with reckless indifference to Plaintiffs' rights.

156. As described in Section I above, Defendants—specifically Defendants Bishop, Burse, Creech, Grace, Hammond, D. Hayder, A. Hayder, Johnson, Marcus, Moreno, Murphy, Roberts, Smoak, Trawick, Van Ackern, Van Reil, and Youngblood—knew that Ms. McElroy was in labor and experiencing a serious medical need. Defendants were deliberately indifferent to Plaintiffs' serious medical needs, including by: (i) ignoring Ms. McElroy's water breaking and failing to take her to the hospital immediately to prevent risks associated with infection, including, potentially, further infection; (ii) failing to closely monitor and examine Ms. McElroy following her amniotic fluid membrane rupture; (iii) failing to provide medical assistance or take Ms. McElroy to the hospital when the pain and contractions of active labor began; (iv) forcing Ms. McElroy to move about the jail and stand in line for meals unassisted while in labor, causing her needless and severe physical and emotional distress; (v) forcing Ms. McElroy to lie on a cold gym floor for 45 minutes while in labor to conduct a punitive search of her pod; (vi) ignoring Ms. McElroy's calls for help and requests to be taken to the hospital and refusing to provide or

obtain medical treatment for her; (vii) providing Ms. McElroy with nothing more than Tylenol during over 24 hours of labor; (viii) failing to assist Ms. McElroy during delivery, despite her agonized screaming and repeated verbal pleas for medical assistance and to be transported to the hospital; and (ix) forcing Ms. McElroy to give birth in her jail pod and for Baby B.T. to be born in detention without access to necessary medical treatment, thereby causing Ms. McElroy agonizing physical pain, endangering her life, and nearly killing Baby B.T. Defendants' conduct caused Plaintiffs physical and emotional injury.

157.   Plaintiffs' constitutional rights were violated as a direct result of the actions and inactions of Defendants named in this Count. These Defendants directly and proximately caused Plaintiffs' physical and emotional injuries, and their conduct was motivated by evil motive or intent and involved reckless or callous indifference to Plaintiffs' federally protected rights.

### Count II

**Plaintiffs Tiffany McElroy and Baby B.T.**
**42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Needs**
**(Fourteenth Amendment—Supervisory Liability)**
**Against Defendants Valenza, Trawick, and Van Reil**

158.   Plaintiffs re-allege and incorporate by reference paragraphs 33–125, 126–135, and 141–151 above.

159.   The U.S. Constitution requires that officials ensure that detained individuals receive adequate food, clothing, shelter, and medical care. Deliberate indifference to the serious medical needs of a person detained pretrial violates the Due Process Clause of the Fourteenth Amendment. Defendants named in Count II, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Plaintiffs in violation of the Fourteenth Amendment.

160.   At all relevant times, Defendants named in this Count were supervisory officials for HCJ staff and were responsible for the creation, development, implementation, oversight, and

34

supervision of policies, customs, and practices regarding medical care at the HCJ, the training of correctional and medical staff on the provision of medical care, and the supervision and discipline of correctional staff and medical staff at the HCJ who were responsible for providing people in the facility with medical care or access to medical care.

161.    As described in Section III above, incidents of delay or denial of medical care to pregnant or postpartum women of a similar nature to the incidents involving Ms. McElroy were not isolated events. Instead, they were obvious, flagrant, rampant, and of a continued duration such that they constitute a history of widespread abuse. As explained above, prior to the events giving rise to Plaintiffs' complaint, Defendants named in this Count had knowledge of both the persistent and widespread policies and practices by medical and correctional employees at the HCJ described above, and the history of widespread delay or denial of medical care for people detained at the facility with serious medical needs, including pregnant and postpartum women like Ms. McElroy.

162.    As explained above, Defendants named in this Count either created or had knowledge that the policies, customs, and practices of delaying or denying necessary medical care for pregnant and postpartum women detained at the HCJ were harmful to the health and wellbeing of the pregnant and postpartum women in their custody and caused them to experience unnecessary pain and suffering that constituted deliberate indifference to constitutional rights. Defendants had such knowledge from various sources, including previous claims and grievances filed by individuals detained at the HCJ, their own observations, and common sense.

163.    Upon information and belief, Defendants named in this Count and/or HCJ staff reporting to them were the recipients of numerous verbal requests, formal grievance complaints, letters, and medical request forms detailing the widespread abuse and persistent practices of unconstitutional deprivations of medical care for pregnant and postpartum women detained at HCJ.

164. Despite knowledge of these repeated unconstitutional deprivations of medical care and the need to correct these deprivations, Defendants named in this Count failed to ensure that people detained at the HCJ, including Ms. McElroy, received adequate medical care and access to medical care.

165. Defendants named in this Count allowed these policies, customs, and practices to persist by failing to provide adequate training and supervision of HCJ staff, failing to adequately punish and discipline personnel who engaged in similar misconduct, and failing to take any minimally adequate action to address these pervasive problems. Accordingly, Defendants named in this Count maintained and ratified policies, customs, and practices that caused the violations of Plaintiffs' constitutional rights described in this complaint.

166. Plaintiffs' injuries were caused by employees of Houston County, and the Houston County Sheriff's Office, including, but not limited to, the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct against Ms. McElroy described in this complaint.

167. Defendants' deliberate indifference to Plaintiffs' serious medical needs directly and proximately caused them physical and emotional injuries, and Defendants' conduct was motivated by evil motive or intent and involved reckless or callous indifference to Plaintiffs' federally protected rights.

## Count III

**Plaintiffs Tiffany McElroy and Baby B.T.**
**42 U.S.C. § 1983 – Denial of Medical Care (Fourteenth Amendment—*Monell*)**
**Against Defendants Houston County and Houston County Commission**

168. Plaintiffs re-allege and incorporate by reference paragraphs 33–151 above.

169. The U.S. Constitution requires that counties provide detained persons, at the expense of the county, necessary medicine and medical attention. A county's policy, custom, or

36

practice of not properly funding medical care for detention facilities subjects the county to municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Defendants Houston County, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Plaintiffs in violation of the Fourteenth Amendment.

170.    As described in Section III above, Defendant Houston County intentionally refused to adequately fund medical care at the HCJ with deliberate indifference to the serious medical needs of people like Ms. McElroy and Baby B.T. Defendant Houston County had a policy, custom, or practice of not adequately funding medical care for people detained at the HCJ. Defendant Houston County ignored known incidents of deliberate indifference at HCJ.

171.    Defendant Houston County is also liable for the acts of Defendant Houston County Commission and its policymakers, as Houston County delegated policymaking authority to them.

172.    As described in Section III above, before the events giving rise to Plaintiffs' complaint, Defendant Houston County had notice of widespread policies, customs, and practices by HCJ staff under which staff routinely denied medical care and access to medical care to detained individuals, like Plaintiffs, with serious medical needs, or provided only delayed access to medical care, often without a medical explanation for the delay. As described above, incidents of delay or denial of medical care in emergency situations of a similar nature to Plaintiffs' were not isolated. To the contrary, they were obvious, flagrant, rampant, and of a continued duration.

173.    There exist policies, customs, and widespread practices at the HCJ pursuant to which pregnant and postpartum women receive unconstitutionally inadequate medical care, including policies, customs, and practices under which pregnant and postpartum women commonly are restricted or limited in receiving regular prenatal and postpartum care; are denied prescription medications; are denied access to breast pumps; are not treated by outside medical

37

providers, even in emergency situations, including active labor; do not receive adequate responses to obvious signs of serious medical needs; do not receive adequate examinations of serious medical conditions; do not receive timely medical care; and do not receive responses to their medical requests or grievances regarding medical care.

174.    Defendant Houston County was on notice and had knowledge that these policies, customs, and practices were harmful to the health and wellbeing of the individuals in custody at the HCJ, including pregnant women, and caused them to experience unnecessary pain and suffering. Defendant Houston County was on notice that its policy, custom, and practice of underfunding medical care at the HCJ caused this harm. Defendant Houston County had such knowledge from various sources, including complaints and grievances filed by people detained at the facility, communications from HCJ staff, media reports, their own observations, and common sense.

175.    Additionally, as described above, because of Houston County's unusually high rate of detaining pregnant and postpartum women, it was particularly foreseeable and plainly obvious that Defendants' deliberate indifference to the serious medical needs of such people would lead to breaches of care and needless pain, suffering, and injuries.

176.    Despite this knowledge, Defendant Houston County did nothing to ensure people detained at the HCJ received adequate medical care and access to medical care. Rather, Defendant Houston County woefully underfunded medical care, with an annual budget of only $125,000 to provide medical care to on average 450 detained individuals. By failing to take any minimally adequate action to address the underfunding and resulting deficiencies in care, Defendant Houston County Commission, as final policymaker of Houston County, ratified the problem and was also deliberately indifferent.

38

177.    Defendants Houston County and Houston County Commission knew or should have known that Plaintiffs' injuries were a plainly obvious consequence of its failure to properly fund or adequately provide medical care at HCJ. Defendants Houston County and Houston County Commission thus caused Plaintiffs' injuries, and their conduct was motivated by evil motive or intent and involved reckless or callous indifference to Plaintiffs' federally protected rights.

**Count IV**

**Plaintiff Tiffany McElroy**
**Alabama State Law Claim – Intentional Infliction of Emotional Distress**
**Against Defendants Bishop, Burse, Creech, Grace, Hammond,**
**D. Hayder, A. Hayder, Johnson, Marcus, Moreno, Murphy, Roberts,**
**Smoak, Trawick, Van Ackern, Van Reil, Youngblood**

178.    Ms. McElroy re-alleges and incorporates by reference paragraphs 33–125 above.

179.    As described in Section I above, by delaying, denying, or providing inadequate medical care to Ms. McElroy, Defendants named in this Count engaged in extreme and outrageous conduct so atrocious in character and extreme in degree as to be outside the common bounds of decency and utterly intolerable in a civilized society.

180.    Defendants' extreme and outrageous conduct included: (i) ignoring Ms. McElroy's water breaking and telling her she "must have peed" herself; (ii) repeatedly forcing Ms. McElroy to move about the jail and stand in line for meals unassisted while in labor, causing her needless and severe physical and emotional distress; (iii) forcing Ms. McElroy to lie on a cold gym floor for 45 minutes while in labor to conduct a punitive search of her pod; (iv) telling Ms. McElroy to insert her fingers into her own vagina to check the baby's progress in full view of other detained individuals, an action that was both painful and humiliating; (v) failing to closely monitor and examine Ms. McElroy following her amniotic fluid membrane rupture and failing to transport her to the hospital immediately to prevent risks associated with infection, including, potentially, further infection; (vi) refusing to transport Ms. McElroy to the hospital once she was in active

labor; (vii) denying Ms. McElroy medical attention or pain medication (beyond a diaper and some Tylenol); (viii) failing to provide medical care or to transport Ms. McElroy to the hospital despite hemorrhaging to the point of anemia; and (ix) failing to assist Ms. McElroy during delivery, despite her agonized screaming and repeated verbal pleas for medical assistance and to be transported to the hospital, ultimately forcing her to give birth on the floor of a jail cell in view of the guards and other detained individuals, covered in blood and other bodily fluids.

181.   Defendants' conduct caused Ms. McElroy emotional distress so severe that no person could be expected to endure it. Defendants' actions nearly caused the deaths of Ms. McElroy and her infant daughter, subjecting Ms. McElroy to the severe emotional trauma of believing her newborn daughter would die due to preventable medical neglect and the fear of losing her own life.

182.   Defendants' outrageous misconduct directly and proximately caused the violation of Ms. McElroy's rights and caused her to suffer traumatic loss, injuries, and damages, including, but not limited to, physical injury, mental anguish, pain and suffering, and severe emotional distress.

183.   Defendants consciously or deliberately engaged in oppression, wantonness, or malice with regard to Ms. McElroy. Defendants acted with a reckless or conscious disregard for the rights and safety of Ms. McElroy, and they subjected her to cruel and unjust hardship in conscious disregard of her rights.

### Count V

**Plaintiffs Tiffany McElroy and Baby B.T.**
**Alabama State Law Claim – Negligent or Wanton Conduct**
**Against Defendants Bishop, Burse, Creech, Grace, Hammond,**
**D. Hayder, A. Hayder, Johnson, Marcus, Moreno, Murphy, Roberts,**
**Smoak, Trawick, Van Ackern, Van Reil, Youngblood**

184.   Plaintiffs re-allege and incorporate by reference paragraphs 33–125 above.

185.    Defendants named in this Count owed a duty to Plaintiffs, including under Alabama Code § 14-6-19. Alabama Code § 14-6-19 requires that Defendants provide detainees in the HCJ "[n]ecessary clothing and bedding"; "[n]ecessary medicine and medical attention to those prisoners who are sick or injured"; and "[f]eminine hygiene products to female prisoners, as soon as is practicable, upon request by the female prisoner."[16]

186.    Defendants had a duty to provide adequate and necessary medication and medical attention to Plaintiffs and other people detained at the HCJ, to ensure that staff under their supervision were adequately trained regarding proper medical care and access to medical care for people like Plaintiffs under their care, and/or to ensure that adequate policies and procedures regarding medical care and access to medical care for people detained at the HCJ were in place.

187.    In the manner described above, Defendants breached the duty of care owed to Plaintiffs by negligently delaying, denying, or inadequately responding to Ms. McElroy's requests for medical care.

188.    Specifically, Defendants failed to provide Ms. McElroy with adequate medical attention, pain medication, or assistance during her labor and delivery, including: (i) requiring Ms. McElroy to move about the jail and stand in line for meals unassisted, causing her needless and severe physical and emotional distress; (ii) forcing Ms. McElroy to lie on a cold gym floor for 45 minutes while in labor to conduct a punitive search of her pod; (iii) failing to closely monitor and examine Ms. McElroy following her amniotic fluid membrane rupture and failing to immediately transport her to the hospital to prevent risks associated with infection, including, potentially, further infection; (iv) ignoring the cries for help from Ms. McElroy and other detained individuals requesting that officers transport Ms. McElroy—then in active labor—to the hospital and provide

---

[16] ALA. CODE § 14-6-19.

her with medical care; and (v) failing to assist Ms. McElroy during delivery (beyond offering her a diaper and some Tylenol), forcing Ms. McElroy to give birth in her jail cell and Baby B.T. to be born in detention without access to necessary medical treatment. Ultimately, Defendants' actions endangered the lives of both Ms. McElroy and Baby B.T., resulting in a detached umbilical cord, delayed delivery of the placenta, acute blood loss, dangerous inflammation, psychological trauma, and other physical traumas.

189. Defendants' actions were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants consciously engaged in the conduct described above with the knowledge that such conduct would probably and likely cause injury to Ms. McElroy and Baby B.T.

190. As a direct and proximate result of Defendants' negligent, wanton, and/or willful conduct, Ms. McElroy suffered injuries, including physical injury, mental anguish, pain and suffering, and severe emotional distress.

191. Defendants consciously or deliberately engaged in oppression, wantonness, or malice, acting with a reckless or conscious disregard for Plaintiffs' rights and safety and subjecting them to cruel and unjust hardship in conscious disregard of their rights.

## OTHER MATTERS

192. All conditions precedent to the bringing of this suit have occurred.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Tiffany McElroy and Baby B.T. respectfully request that this Court enter a judgment in their favor and against Defendants as follows:

   i. An award of compensatory, punitive, and nominal damages against all Defendants;

   ii. An award of prejudgment and post-judgment interest at the highest rates allowed by law;

iii.  An order awarding Plaintiffs reasonable costs, including attorneys' fees and expert witness

fees, incurred in bringing this action;

iv.  An order awarding Plaintiffs appropriate declaratory relief; and

v.  Any other relief as the Court deems just and equitable.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: May 12, 2026

Respectfully Submitted,

/s/ *Rebecca R. Ramaswamy*
Rebecca R. Ramaswamy
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104
Telephone: (504) 535-9035
rebecca.ramaswamy@splcenter.org

Krista Dolan (*pro hac vice* pending)
SOUTHERN POVERTY LAW CENTER
PO Box 10788
Tallahassee, FL 32302
Telephone: (850) 688-3908
krista.dolan@splcenter.org

Jessica K. Cochrane (*pro hac vice* pending)
PREGNANCY JUSTICE
223 W. 38th St., #1416
New York, New York 10018
Telephone: (212) 255-9252
jess.c@pregnancyjusticeus.org

Amanda Flug Davidoff (*pro hac vice* pending)
Jessica Klein (*pro hac vice* pending)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000

43

Facsimile: (212) 558-3588
davidoffa@sullcrom.com
kleinj@sullcrom.com

*Attorneys for Plaintiffs Tiffany McElroy and Baby B.T.*