IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TIFFANY MCELROY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:26-cv-00372-BL-SMD |
| | ) | |
| HOUSTON COUNTY, ALABAMA, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

On May 12, 2026, the Plaintiffs filed this 42 U.S.C. § 1983 action alleging that the Defendants denied Tiffany McElroy necessary medical care while she was detained at the Houston County Jail ("HCJ"). (Doc. 1). Count II asserts a Fourteenth Amendment deliberate-indifference claim on a theory of supervisor liability against Sheriff Donald Valenza, Lieutenant James Trawick, and Lieutenant Brenda Van Reil. (Doc. 1 at 34-36). Count III asserts a Fourteenth Amendment claim under § 1983 against Houston County, Alabama, and the Houston County Commission (the "County Defendants"), alleging that their funding policies and practices caused the denial of necessary medical care. (Doc. 1 at 36-39).

On June 29, 2026, the County Defendants moved to dismiss Count III, which is the only count asserted against them. (Doc. 27). On the same day, Valenza filed a Motion to Dismiss Count II as asserted against him in his individual capacity.

(Doc. 28). The Plaintiffs filed responses in opposition to the pending motions (docs. 41, 42), and the County Defendants and Valenza filed reply briefs (docs. 62, 63). The Defendants' Motions to Dismiss are now ripe for review.

For the reasons set forth below, the court finds that the Defendants' Motions to Dismiss are due to be granted. Count II remains pending against Defendants Trawick and Van Reil, who have not moved to dismiss the claims asserted against them.

## I. Factual Allegations and Claims

The allegations in the Complaint, taken in the light most favorable to the Plaintiffs, establish the following facts.[1]

The Complaint alleges that Tiffany McElroy was detained at HCJ "[o]n or around May 23, 2024," when she was "approximately 34 weeks pregnant." (Doc. 1 at 8). McElroy alleges that she "directly inform[ed] the jail at booking that she was in her third trimester of pregnancy." (Doc. 1 at 8). McElroy alleges that on May 26, 2024, her "water broke before 37 weeks of pregnancy." (Doc. 1 at 10). The Complaint characterizes this condition as preterm premature rupture of membranes ("PPROM") and alleges that "[p]atients with PPROM should be evaluated by a qualified provider as soon as possible to assess for labor, bleeding, risk of infection,

[1] At the motion-to-dismiss stage, the court accepts the Complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the Plaintiffs' favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-69 (2009).

and fetal heart rate pattern." (Doc. 1 at 10). The Complaint alleges that Defendant Deputy Kathy Youngblood "witnessed [McElroy's] water break" and "alerted her supervisor Defendant Van Reil about what she witnessed." (Doc. 1 at 10). Following the alert to Van Reil, Van Reil "ordered her back to her bay, telling her that her water had not broken and she 'must have peed' on herself." (Doc. 1 at 10).

The Complaint alleges that Youngblood told Nathina Whitaker, another detainee in the HCJ, that she had "notified Defendants [Jason] Smoak (the physician assistant at the HCJ) and [Melinda] Van Ackern (the nurse) that [McElroy's] water had broken, and that they would be there shortly to check on her." (Doc. 1 at 11). "When Ms. Whitaker asked Defendant Youngblood why she would not call 911, Defendant Youngblood told her she was not allowed." (Doc. 1 at 11). The Complaint further alleges that despite staff members documenting that McElroy's water had broken, "no medical staff came to O-Pod to evaluate her." (Doc. 1 at 11).

Later that morning, Defendant Corporal Marquel Bishop brought McElroy to the medical clinic. (Doc. 1 at 12). The Complaint alleges that Van Ackern "acknowledged that [McElroy] walked to the clinic clutching her abdomen and bending over in pain," checked the fetal heart tones, "which registered at 166, above the normal range," and provided McElroy with "a diaper and a clean jumpsuit, gave her Tylenol, and sent her back to the pod to rest." (Doc. 1 at 12). The Complaint

further asserts that "Defendant Smoak … made no effort to meet even the most basic standard of care by arranging emergency medical care." (Doc. 1 at 12).

The Complaint alleges that McElroy was in labor for more than 24 hours and that Baby B.T. was born around 4:00 a.m. on May 27, 2024, and "was not crying or breathing, and … looked limp and blue." (Doc. 1 at 20). The Complaint further alleges that McElroy gave birth "without any medication or medical assistance" and that it was not until the other detainees "delivered Baby B.T. that Defendants … finally came into the bay." (Doc. 1 at 20-21). After delivering Baby B.T., McElroy "was transported to Southeast Health hospital, where she was admitted at 4:47 a.m. on May 27[, 2024]" and Baby B.T. "was transferred to the neonatal intensive care unit." (Doc. 1 at 23).

The factual allegations above give rise to the two claims at issue here. Count II is titled "42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Needs (Fourteenth Amendment – Supervisory Liability)" and is asserted against Valenza, Trawick, and Van Reil (the "Count II Defendants"). (Doc. 1 at 34-36). As to Valenza, the Plaintiffs allege that he was responsible for "the operation of the HCJ" and had "final authority and responsibility for administering, managing, and supervising medical care services at the HCJ." (Doc. 1 at 5). The Plaintiffs also allege that the Count II Defendants allowed policies and practices to persist by "failing to provide adequate training and supervision of HCJ staff" and "failing to

adequately punish and discipline personnel who engaged in similar misconduct." (Doc. 1 at 36).

Count III is titled "42 U.S.C. § 1983 – Denial of Medical Care (Fourteenth Amendment – *Monell*)" and is asserted against the County Defendants. (Doc. 1 at 36-39). The Plaintiffs allege that the County Defendants "intentionally refused to adequately fund medical care at the HCJ," maintained "a policy, custom, or practice of not adequately funding medical care," and "knew or should have known that [the] Plaintiffs' injuries were a plainly obvious consequence of its failure to properly fund or adequately provide medical care at HCJ." (Doc. 1 at 37-39).

## II. Legal Standard

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires a short and plain statement of the claim showing that the pleader is entitled to relief." *Sanders v. Zalesky*, No. 1:25-CV-71-WKW, 2026 WL 579503, at *1 (M.D. Ala. Mar. 2, 2026) (internal quotations and citation omitted). When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).

To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (citation omitted).

The allegations in the complaint should present a "plain statement possess[ing] enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 557. "Mere 'labels and conclusions or a formulaic recitation of the elements of a cause of action will not do,' and a plaintiff cannot rely on 'naked assertions devoid of further factual enhancement.'" *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." *Iqbal*, 556 U.S. at 678-79. A plaintiff must "allege[] enough facts to nudge his claim … across the line from conceivable to plausible." *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 570).

## III. Discussion

### A. Defendant Valenza's Motion – Count II

#### 1. The Parties' Arguments

Valenza argues that the "Plaintiffs do not allege that Defendant Valenza personally participated in any constitutional violation." (Doc. 29 at 11). Further, Valenza argues that the "Plaintiffs allege no facts tying Defendant Valenza to the creation, implementation, or maintenance of the alleged policy beyond his role as Sheriff." (Doc. 29 at 18). The Plaintiffs respond that the "Complaint alleges that Defendant Valenza had final authority over the administration and supervision of medical care at the HCJ; that he and his staff received repeated grievances and reports concerning those practices; and that he failed to train, supervise, or discipline his staff." (Doc. 41 at 18).

#### 2. Supervisory Liability

Since Plaintiff McElroy was a pretrial detainee, her claims arise under the Fourteenth Amendment's Due Process Clause. *See Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1574 (11th Cir. 1985) (holding that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care[,] the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons."). Indeed, the Eleventh Circuit has "noted that 'decisional law involving prison inmates applies equally to cases

involving arrestees or pretrial detainees' when it comes to '[c]laims involving the mistreatment of arrestees or pretrial detainees in custody.'" *Ireland v. Prummell*, 53 F.4th 1274, 1288 (11th Cir. 2022) (quoting *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996)).

The United States Constitution prohibits "a prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate" because "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 828, 833 (1994) (citations omitted). To state a deliberate-indifference claim, the Plaintiff must sufficiently allege (1) the objective component by showing she had a serious medical need; (2) the subjective component by showing that the Defendant acted with deliberate indifference to her serious medical need; and (3) that the Defendant's deliberate indifference caused the injury. *See Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc); *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). Moreover, the Eleventh Circuit, sitting en banc, has held that

> a deliberate-indifference plaintiff must prove that the defendant acted with subjective recklessness as used in the criminal law, and that in order to do so, the plaintiff must show that the defendant was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm—with the caveat that, in any event, a defendant who respond[s] reasonably to a risk, even a known risk, cannot be found liable under the Eighth Amendment.

*Wade*, 106 F.4th at 1255 (en banc) (citations and quotations omitted).

For purposes of the pending motions, the court assumes, without deciding, that the Complaint plausibly alleges an underlying Fourteenth Amendment violation by jail personnel. On that assumption, the court finds that Count II fails, insofar as it pertains to Valenza, because the Complaint does not plausibly allege Valenza's deliberate indifference or a causal connection between Valenza's conduct and the assumed Fourteenth Amendment violation.

"'It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.'" *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)). "Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id*. Under *Cottone*, the causal connection can be established (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) "when a supervisor's custom or policy ... result[s] in deliberate indifference to constitutional rights"; or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act

unlawfully and failed to stop them from doing so." *Id*. (citations and quotations omitted).

Here, the Complaint alleges that Valenza had "final authority and responsibility for administering, managing, and supervising medical care services at the HCJ." (Doc. 1 at 5). The Complaint does not, however, allege that Valenza was present, received information concerning McElroy, made a treatment decision, directed an employee to deny care, or knew a subordinate would deny care and failed to stop them from doing so. Indeed, the allegation concerning Valenza's authority does not identify an act or omission by Valenza.

The court also finds that the widespread abuse allegations are insufficient. The Complaint alleges, at paragraph 162, that the Count II Defendants "either created or had knowledge" of harmful policies, customs, and practices from "previous claims and grievances," "their own observations, and common sense." (Doc. 1 at 35). The Complaint further alleges, at paragraph 163, that,

> [u]pon information and belief, [the] Defendants named in this Count and/or [Houston County Jail] staff reporting to them were the recipients of numerous verbal requests, formal grievance complaints, letters, and medical request forms detailing the widespread abuse and persistent practices of unconstitutional deprivations of medical care for pregnant and postpartum women detained at [the Houston County Jail].

(Doc. 1 at 35). However, these collective and conclusory allegations do not state what Valenza allegedly knew, when he knew it, or what information made him aware that his own conduct created a substantial risk of harm. Pursuant to *Wade*, a

deliberate-indifference plaintiff must demonstrate that the defendant "was *actually aware* that his own conduct caused a substantial risk of serious harm to the Plaintiff." *Wade*, 106 F.4th at 1261 (emphasis added). The court finds *Iqbal* to be instructive. There, the Supreme Court held that the allegations that the defendants "knew of, condoned, and willfully and maliciously agreed to subject" the plaintiff to unlawful conditions were conclusory and not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 680-81.

The Eleventh Circuit has noted that "[t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Hartley*, 193 F.3d at 1269 (quotations omitted). The Complaint identifies an April 2023 incident involving an inmate named Heather Shirah as well as other medical incidents over several years. (*See* Doc. 1 at 27-32). Several of these alleged incidents are pleaded "upon information and belief" or are drawn from unadjudicated complaints. The Complaint fails to allege that Valenza was Sheriff for the alleged 2009 incident involving Jonathan McCall, that Valenza had knowledge of the alleged April 2023 Shirah incident, or what if anything Valenza knew about other incidents, claims, or lawsuits. Moreover, the Complaint's allegation that the Defendants "have been the subject of dozens of federal lawsuits regarding denial of medical care since 2011" establishes only the existence of

lawsuits; it does not, without more, plead facts about the alleged incidents or reports received by Valenza. (Doc. 1 at 30).

The custom or policy theory fails for the same reason. Here, the Complaint alleges generally a custom of delaying, denying, or providing inadequate medical care. (*See* Doc. 1 at 26-27, 35-36). However, "[a] custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law." *Goebert*, 510 F.3d at 1332. In order for the Plaintiffs to plead an unwritten custom attributable to Valenza, the Plaintiffs must allege that the asserted practice was persistent and widespread to constitute a custom and that it caused the alleged deprivation. *See id.* A supervisor who did not personally participate in the deprivation is liable "only if the plaintiff can show that the supervising official's actions caused the alleged constitutional deprivation," and that his "custom or policy reflected deliberate indifference to the plaintiff's constitutional rights." *Bridges v. Poe*, 155 F.4th 1302, 1314 (11th Cir. 2025). Moreover, the "plaintiffs need to show that [a supervisor] knew about 'multiple incidents or multiple reports of prior misconduct by a particular employee.'" *Id*. (quoting *Piazza v. Jefferson Cnty*., 923 F.3d 947, 957 (11th Cir. 2019)). The court finds that the Complaint fails to do so.

As discussed above, paragraphs 162 and 163 of the Complaint allege the Count II Defendants' knowledge collectively and upon information and belief. However, the court notes that these collective allegations fail to state what Valenza

knew, when Valenza knew it, or what information made Valenza aware that his own conduct created a substantial risk of harm. Under *Wade*, the Plaintiffs must demonstrate that Valenza "was actually aware that his own conduct caused a substantial risk of serious harm." *Wade*, 106 F.4th at 1261. Moreover, the Complaint fails to identify a written policy or facts showing that Valenza created, adopted, or maintained an unwritten policy.

The Plaintiffs further allege that the Count II Defendants allowed the asserted policies to persist "by failing to provide adequate training and supervision of" HCJ staff and by "failing to adequately punish and discipline personnel who engaged in similar misconduct." (Doc. 1 at 36). The Plaintiffs' response contends that "Defendant Valenza failed to ensure adequate medical care, failed to provide adequate training and supervision of staff, [and] failed to discipline personnel who similarly denied necessary medical care." (Doc. 41 at 10-11). However, the Complaint fails to identify training programs, training omissions, supervisory practices, or disciplinary decisions by Valenza. Nor does it plead nonconclusory facts showing that Valenza personally received notice of the asserted deficiencies. As such, the court finds that the Complaint's collective allegations fail to plausibly establish a causal connection to Valenza's own conduct.

### 3. Qualified Immunity

The court notes that its conclusion that the Complaint fails to state a supervisory-liability claim against Valenza resolves his motion. Nevertheless, the court will address qualified immunity as an alternative ground for dismissal.

Valenza argues that he "has met his initial burden of demonstrating that he was a government official acting within the scope of his discretionary authority at the time of the events giving rise to this litigation." (Doc. 29 at 10). The Complaint alleges that Valenza "is, and was at all times, the Sheriff of Houston County, acting under color of state law and within the scope of his employment" and that Valenza "has final authority and responsibility for administering, managing, and supervising medical care services at the HCJ." (Doc. 1 at 5). Thus, the court finds that Valenza has carried his initial burden of showing that he acted within his discretionary authority. *See Piazza*, 923 F.3d at 951 ("An officer asserting a qualified-immunity defense bears the initial burden of showing that he was acting within his discretionary authority." (quotations omitted)). As such, the burden has shifted to the Plaintiffs to establish "that (1) [Valenza] violated a constitutional right and (2) the right was clearly established at the time of the alleged violation." *Id*. Because the Complaint does not plausibly allege that Valenza himself violated the Fourteenth Amendment, he is entitled to qualified immunity. However, the court will address the clearly-established prong as an alternative and independent ground.

The Plaintiffs argue that McElroy had a clearly established right to medical care during labor and delivery. (*See* Doc. 41 at 25). The Plaintiffs assert that they can show fair warning through a materially similar case, "a broad statement of principle," or conduct "so egregious that a constitutional right was clearly violated, even in the total absence of case law." (Doc. 41 at 25). Further, the Plaintiffs assert that the alleged denial of care was "so plainly barbaric on its face that a constitutional violation is incontrovertibly established." (Doc. 41 at 27).

Valenza replies that the Plaintiffs "have not identified clearly established law demonstrating that his own conduct violated the Constitution." (Doc. 62 at 11). Valenza maintains that the proper inquiry is whether "clearly established law would have put a reasonable sheriff on notice that he could be held personally liable under § 1983 where he did not personally participate in treatment decisions, was not personally present during the alleged deprivation, [and] was not personally informed of the detainee's condition." (Doc. 62 at 12). Valenza further argues that the Plaintiffs' cited cases do not "clearly establish supervisory liability against a sheriff based solely on generalized allegations regarding jail operations." (Doc. 62 at 14). Moreover, as to the Plaintiffs' alternative theory of obvious clarity, Valenza argues that the obvious clarity exception "applies only when the conduct so obviously violates the constitution making analysis of prior case law unnecessary" and that the

"conduct alleged here falls far outside the 'rare' circumstances in which obvious clarity can overcome the absence of controlling precedent." (Doc. 62 at 14).

The court finds that the clearly established prong independently supports dismissal. Under Eleventh Circuit precedent, a right may be clearly established by (1) "case law with indistinguishable facts," (2) "a broad statement of principle within the Constitution, statute, or case law," or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021). However, the Supreme Court has warned courts not to "define clearly established law at a high level of generality" and, for that reason, "the second and third paths are rarely-trod ones." *Id*. (quotations omitted). Thus, the question remains whether clearly established law put Valenza on notice that *his own conduct* was unlawful. As stated above, *Wade* requires that the defendant was actually aware that his own conduct caused a substantial risk of serious harm. *See Wade*, 106 F.4th at 1261.

The Plaintiffs rely on *Goebert* for the proposition that the Eleventh Circuit "held that a pregnant detainee who was leaking amniotic fluid had a serious medical need and that unjustified delay in treatment by officials with knowledge of that need violated clearly established law." (Doc. 41 at 26). However, *Goebert* involved an individual capacity claim concerning a Captain who received a detainee's written complaint and responded, "Medical can set up [an appointment with an obstetrician]

at your expense if you desire." *Goebert*, 510 F.3d at 1320. As such, the Captain in *Goebert* had direct notice of the detainee's condition and personally responded to her request; the Complaint here does not plausibly allege that Valenza received comparable information about McElroy or participated in a decision concerning her care. Thus, *Goebert* is distinguishable and does not clearly establish Valenza's liability on the collective allegations in this Complaint.

Likewise, the Plaintiffs' reliance on *Lancaster v. Monroe County* and *Harris v. Coweta County* does not clearly establish that Valenza's conduct was unconstitutional. In *Lancaster*, the sheriff was told that the detainee "would have a seizure in eight to ten hours" without alcohol or medicine and that "his last seizure had almost killed him." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1422 (11th Cir. 1997). In *Harris*, the sheriff received a report from a physician that the detainee's "salvageability of [his] hand [was] markedly in question" and that "further delay must be avoided at all cost." *Harris v. Coweta Cnty.*, 21 F.3d 388, 391 (11th Cir. 1994). Both *Lancaster* and *Harris* concern a sheriff's response after receiving specific information about a detainee's serious medical condition. They do not, however, give fair warning that Valenza could be liable on the collective allegations in this Complaint.

Alternatively, the Plaintiffs rely on an unpublished decision from the Eleventh Circuit for the proposition that the alleged denial of care was "so plainly barbaric on

its face that a constitutional violation is incontrovertibly established." (Doc. 41 at 27). While the alleged conduct of HCJ personnel is serious, the Plaintiffs seek to hold Valenza liable for their conduct. However, for obvious clarity to apply, it must have been so obvious that Valenza's own acts or omissions were unconstitutional. *See Hughes v. Locure*, 166 F.4th 121, 128 (11th Cir. 2026) (obvious clarity is "a principle or provision so clear that, even without specific guidance from a decision involving materially similar facts, the unlawfulness of the officer's conduct is apparent."). Here, the court notes that the Complaint fails to allege that Valenza knew about McElroy's condition, participated in a treatment decision, or knew that his own conduct created a substantial risk of harm. Thus, because the Complaint fails to allege a causal connection or that Valenza himself knew of the alleged denial of care, the alleged unlawfulness of Valenza's conduct was not obvious.

Accordingly, Valenza's Motion to Dismiss (doc. 28) is due to be granted.

### B. County Defendants' Motion – Count III

#### 1. The Parties' Arguments

The County Defendants argue that the Complaint "focuses squarely upon conduct of employees of the Houston County Sheriff" and that "those allegations can't impose liability on Houston County." (Doc. 27 at 1). The County Defendants acknowledge that the Plaintiffs must allege a County policy and causation, but they contend that the Complaint does not "identify a request for medical funding by the

Sheriff" that the County Defendants denied, does not "allege that an employee of the Jail said treatment couldn't be provided to McElroy because of lack of funding," does not allege that "Houston County refused to pay for medical treatment received by McElroy or her baby," and does not "identify any person at any time who did not receive medical treatment because of funding." (Doc. 27 at 6-7). The County Defendants further assert that "there is no causal connection between Houston County's funding decisions and McElroy's treatment in the jail." (Doc. 63 at 2). Moreover, the County Defendants argue that there are "no facts in the [C]omplaint that can connect any funding decision by Houston County to the treatment McElroy received in the Jail." (Doc. 63 at 6).

The Plaintiffs respond that the Complaint alleges "a policy of underfunding medical care at the HCJ and providing personal financial incentives to County employees … to cut medical costs." (Doc. 42 at 3-4). Specifically, the Plaintiffs point to the Complaint's allegations concerning the County's medical and dental budget for detainees and its employee incentive program for "spending efficiency." (Doc. 1 at 29-30). The Plaintiffs argue that these allegations support an inference that the County "incentivized and encouraged a policy, custom, or practice of denying or delaying outside medical care, including emergency hospital care" and "created a system that disincentivized HCJ staff from providing necessary care" and hospital transfers. (Doc. 42 at 10, 15).

**2. County Funding Policy and Causation**

For purposes of the pending motions, the court assumes, without deciding, that the Complaint plausibly alleges an underlying Fourteenth Amendment violation by jail personnel. On that assumption, the court finds that Count III fails because the Complaint does not plausibly allege a County policy that constituted deliberate indifference or caused the alleged Fourteenth Amendment violation.

Alabama law divides responsibilities for county jails between the sheriff and the County. The sheriff, rather than the County, operates the jail and supervises jail personnel. Under the Alabama Code, the sheriff has "the legal custody and charge of the jail in his county and all prisoners committed thereto[,]" and "appoints, directs, and controls the deputies and jailers who work at the jail." *Turquitt v. Jefferson Cnty., Ala.*, 137 F.3d 1285, 1289 (11th Cir. 1998) (quoting Ala. Code § 14-6-1 and citing Ala. Code § 14-6-105). By contrast, the County's duties "'are limited to funding the operation of the jail and to providing facilities to house the jail.'" *Id.* (quoting *Stark v. Madison County*, 678 So. 2d 787, 787 (Ala. Civ. App. 1996)). However, this division of responsibilities does not prevent liability for the County's own funding decisions or policies. In *Ancata v. Prison Health Services, Inc.*, the Eleventh Circuit held that a county could be liable if it "established or utilized a policy or custom" governing access to outside medical care and "the result of that policy or custom played a role in the delay in treatment and deliberate indifference

shown" to the detainee. 769 F.2d 700, 705-06 (11th Cir. 1985). Thus, although the County does not operate the jail or supervise its personnel like the sheriff, it remains responsible "to refrain from establishing a policy that violates inmates' constitutional rights." *Smothers v. Childers*, 159 F.4th 922, 935 (11th Cir. 2025).

The court notes that the Plaintiffs are not required at the pleading stage to prove their claim with evidence. However, the Plaintiffs must plausibly allege a County policy or practice that caused their injury. The Eleventh Circuit has held that a plaintiff need only "allege a policy, practice, or custom . . . which caused" the alleged constitutional deprivation to survive a Rule 12(b)(6) motion. *Hoefling v. City of Miami*, 811 F.3d 1271, 1280 (11th Cir. 2016). Here, the court finds that the Complaint fails to meet this standard.

The Eleventh Circuit has held that, to impose liability on a county, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the [county] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). Further, "every injury suffered at the hands of a municipal employee can be traced to a . . . budget decision[]." *Id*. at 1292. Thus, "'[t]o prevent municipal liability for a . . . decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.'" *Id*. (quoting *Bd. of Cnty.*

*Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) (emphasis in original)). Moreover, a budget decision that makes a constitutional violation "more *likely* . . . cannot 'give rise to an inference that a policy maker's failure to scrutinize the [budget] . . . produced a specific constitutional allegation.'" *Id.* (quoting *Brown*, 520 U.S. at 411). Furthermore, "liability must be premised on a finding that '*this*' budget decision was 'highly likely to inflict the *particular* injury'" alleged. *Id.* (emphasis in original).

Here, the Complaint alleges that "the total Houston County budget for medical and dental expenses for people in detention in 2023 and 2024 was only $125,000," that the projected expenses "were more than $26,000 greater than" the County's budget for the same period, and that the Commission "award[ed] employees for 'spending efficiency,' which includes finding ways to cut medical costs that the County is required to pay." (Doc. 1 at 29-30). The Complaint further alleges that "Defendant Smoak was a recipient of this award." (Doc. 1 at 30). However, the court notes that, while the allegations in the Complaint identify the asserted County funding and incentive policies, the Complaint fails to assert facts connecting either policy to the alleged refusal to obtain emergency care for McElroy.

As stated above, the Plaintiffs argue that these allegations support an inference that the County "incentivized and encouraged a policy, custom, or practice of denying or delaying outside medical care, including emergency hospital care" and

"created a system that disincentivized HCJ staff from providing necessary care" and hospital transfers. (Doc. 42 at 10, 15). The court considers this inference. However, the court finds that the Complaint does not allege that the Commission was told that its budget or spending efficiency programs caused detainees of the HCJ to be denied medical care, or that the Commission retained either alleged practice after learning it caused a denial of medical care. Nor does the Complaint allege that Defendant Smoak's award concerned medical care of detainees, outside transport of detainees, or any decision affecting McElroy. Further, the Complaint fails to allege that a County employee denied care to save money or that HCJ personnel refused to call 911 because the County would be responsible for the cost. Rather, the Complaint alleges only that Defendant Youngblood stated that she "was not allowed" to call 911. (Doc. 1 at 11). The Complaint does not allege who imposed that restriction or connect that restriction to County funding.

In *Smothers*, which arose from summary judgment disposition rather than on the pleadings, the county made a "deliberate decision to continue and then renew its contract" with a provider despite evidence that the provider was delivering deficient care. *Smothers*, 159 F.4th at 932. The *Smothers* court concluded that there was "ample evidence for a reasonable jury to find that the county knew that [the provider] was providing inadequate medical care." *Id*. at 933. Here, however, the Complaint

fails to allege comparable notice to the Commission that its budget or incentive program was causing the particular denial or delay of emergency care at the HCJ.

The court finds that the alleged causal link between County policy and the Plaintiffs' injuries is too speculative. The Complaint alleges that the County had a low medical budget and a program that rewarded cost savings. However, the Complaint does not assert a County decision requiring HCJ personnel to delay or deny outside care, does not assert an award tied to the Plaintiffs' medical care or transport, and does not assert whether there was communication between the County and HCJ personnel to withhold care to save the County money.

The County is liable only if its "deliberate conduct … was the moving force behind the injury alleged." *McDowell*, 392 F.3d at 1292 (quotation marks omitted). A budget decision that might make a violation "more likely" does not, without more, show that it "produced a specific constitutional" violation. *Id*. Here, the court would have to assume that the County's cost-saving policies caused Defendant Youngblood's refusal to call 911. However, *McDowell* does not permit the court to do so. Thus, because the court finds that Count III does not plausibly allege that a County policy caused the alleged denial of emergency care to the Plaintiffs, it is due to be dismissed.

Accordingly, the County Defendants' Motion to Dismiss (doc. 27) is due to be granted.

## IV. Conclusion

Accordingly, for the reasons stated above, it is hereby **ORDERED** as follows:

1. Defendant Donald Valenza's Motion to Dismiss (doc. 28) is **GRANTED**. Count II against Defendant Valenza in his individual capacity is **DISMISSED without prejudice**.
2. The Motion to Dismiss (doc. 27) filed by Houston County, Alabama, and the Houston County Commission is **GRANTED**. Count III is **DISMISSED without prejudice**. The Clerk of Court is **DIRECTED** to terminate Defendants Houston County, Alabama, and the Houston County Commission as parties to this action.
3. The Motion to Stay (doc. 75) filed by Defendants Valenza, Houston County, Alabama, and the Houston County Commission is **DENIED as moot**.
4. Count II remains pending as to Defendants Trawick and Van Reil.

**DONE** and **ORDERED** on this the 9th day of October, 2026.

**BILL LEWIS**
UNITED STATES DISTRICT JUDGE